Law Office of David R. Giles
By: David R. Giles, Esq.
34 Rynda Road
South Orange, New Jersey 07079
973-763-1500
davidgiles@davidgileslaw.com

Attorney for the Plaintiffs

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| R.B. and C.B., individually and on behalf of V.B., R.B. and S.B.,<br><br>Plaintiffs,<br><br>v.<br><br>MIDDLETOWN TOWNSHIP BOARD OF EDUCATION,<br><br>Defendant. | Civil Action No.:<br><br><br><br>**COMPLAINT** |

Plaintiffs, R.B. and C.B., individually and on behalf of V.B., R.B. and S.B., allege as follows:

### JURISDICTION

1.    This court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction under 28 U.S.C. § 1367.

### VENUE

2.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant resides and the acts and omissions giving rise to Plaintiffs' claims occurred herein.

## PARTIES

3.    Plaintiffs, R.B. and C.B., are the parents of V.B., R.B., and S.B.

4.    R.B. and C.B. are domiciled in the Middletown Township School District ("the District").

5.    Defendant Middletown Township Board of Education ("the Board") is the body corporate responsible for the conduct and supervision of the District's public schools, which serves students age three through twenty-one residing in the District.

6.    The District is a recipient of federal financial assistance from the United States Department of Education, and, as such, it is subject to the requirements of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

7.    The District is also a "public entity," and, as such, it is subject to the requirements of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

## FACTS

### (C.B., HER FAMILY, AND HER DISABILITY)

8.    R.B. and C.B. are married and have three young children, S.B., R.B., and V.B., respectively, three, five, and six years old.

9.    The family lives in a home in Middletown, New Jersey.

10.  R.B. works full-time as an Italian teacher in a high school in a nearby school district.

11.  C.B. is certified to teach social studies and special education.

12.  She worked in one of the District's high schools as a one-to-one, paraprofessional, aide for a student with autism until V.B. was born in May 2016.

13.  Since then, she stopped working to raise her children.

14.  C.B. is diagnosed with Usher syndrome, a rare genetic condition that causes both hearing and vision loss (deaf-blindness).

15.  Vision loss is caused by a degenerative eye disease called retinitis pigmentosa which causes night-blindness and a loss of peripheral vision ("tunnel vision") that worsens over time.

16.  C.B. has a moderate-to-severe hearing loss for which she has worn hearing aids since she was two years old.

17.  Even with hearing aids, her hearing remains impaired because she has difficulty hearing ambient sounds. It is hard for her to hear sounds unless she is looking in the direction of the sound. It is difficult to distinguish ambient sounds or determine from where they are coming.

18.  Because of her visual and hearing impairments, movement and ambient noise in the environment can cause confusion and disorientation and feel very chaotic.

19.  Her vision has deteriorated to the point that, in February 2020, she received the devastating news that she was legally blind.

20.  Whereas a typical person has a field of vision of 180 degrees, C.B.'s field of vision had narrowed to only 12 degrees.

21.  Consequently, she can only see what she is looking at directly through a small window of sight as if she were looking through a single toilet paper tube.

22.  The following figures provide a visual picture of how C.B.'s vision is limited by tunnel vision and how it compares to that of a typical person (a typical person's field of vision is actually even wider than what is depicted in these pictures).

 

**Figure 1**

 

**Figure 2**

(THE DISTRICT AND IT'S TRANSPORTATION PROGRAM)

23.  The District serves approximately 9,600 students in eighteen schools, five of which offer preschool to children age 3-5.

24.  Under New Jersey's compulsory education law, every parent, guardian or other person having custody and control of a child between the ages of six and 16 years must "cause such child regularly to attend the public schools" of the district in which they live, unless they otherwise ensure that they are properly educated. N.J.S.A. 18A:38-25.

25.  Any parent who fails to cause a school-age child to attend school regularly may be deemed a "disorderly person" and subjected to financial penalties. N.J.S.A. 18A:38-31.

26.   To assist parents and families in getting their children to school, Congress and the New Jersey Legislature have passed laws that require school districts to transport children to school or provide them financial aid in lieu of transportation in certain situations.

27.   State laws also give school districts the discretion to provide transportation to children in other situations.

28.   Accordingly, the Board has adopted a Student Transportation Policy and Regulation (District Policy 8600 and District Regulation 8600) that require the District to transport students in the following circumstances:

a.   a public school student lives remotely from the public school (remotely means more than two miles for an elementary school student and more than two and a half miles for a secondary school student);

b.   an eligible nonpublic school student lives remotely from the nonpublic school;

c.   a student attends a charter or renaissance school;

d.   a student with a disability requires transportation because of his or her special needs;

e.   a student attends school in another district through New Jersey's Interdistrict Public School Choice Program;

f.   a student's family is homeless;

g.   a student lives in a group home;

h.   a student's custody is shared and lives in two households;

    i.   a student is placed in a resource family home by the Division of Child Protection and Permanency; and

    j.   a non-remote student must walk to and from school along a hazardous route.

29.  In 2017, the District transported approximately 4,950 students in 27 in-District school programs and over 1,400 students to various public and non-public school programs outside of the District (more recent data regarding transportation are not known by Plaintiffs).

30.  The District also transports students to hundreds of sports events and field trips.

### (PLAINTIFFS' INITIAL REQUEST FOR TRANSPORTATION AFTER C.B. WAS DECLARED LEGALLY BLIND IN MARCH 2020)

31.  In September 2019, when she was three years old, V.B. began preschool at the District's New Monmouth Elementary School, which is about 1.5 miles from Plaintiffs' home.

32.  Preschool in the District is a half-day program, so children attend either in the morning or afternoon.

33.  V.B. attended preschool in the afternoon from 12:15 to 2:45 p.m.

34.  When V.B. began preschool, C.B. was still able to drive, and she drove her to school.

35.  However, C.B. was declared legally blind in February 2020, and, since then, she has not been able to drive.

36.  After that, getting V.B. to and from school became a serious problem for her parents as R.B. leaves for work before the school day in the District begins and leaves work after it ends.

37.  With C.B.'s visual and hearing impairments, it would have been extremely difficult and dangerous for her to walk V.B. to and from school, especially while also caring for her two younger children, then a toddler and an infant.

38.  C.B.'s visual impairment makes it difficult to see anything along the route to school, including her children, obstacles on the street or sidewalk, low hanging branches, or moving vehicles, unless she is looking directly at them through her narrow field of vision.

39.  Her hearing impairment also makes it difficult to hear ambient noise along the route, including noise from her children, other people, weather, or moving vehicles, unless she is already looking in the direction of the sound.

40.  It is also difficult to distinguish these ambient sounds or determine from where they are coming.

41.  Not only would it have been extremely dangerous for C.B. to walk 1.5 miles back and forth to New Monmouth twice a day to walk V.B. to and from school while also bringing her toddler and infant children in a stroller, it would have been

overwhelming and exhausting for her to try to maneuver the route safely.

42.   Indeed, no other families walk their children to school this distance as most if not all have someone in the family who is able to drive them to school.

43.   On March 11, 2020, C.B. met with the District's Superintendent, then William George, Ed.D., and Transportation Coordinator, Barbara Vining, to request transportation for V.B. since she was unable to drive or safely walk her to school.

**(THE DISTRICT'S INITIAL AGREEMENT TO HELP PLAINTIFFS BY TRANSPORTING V.B. DURING THE 2019-2020 AND 2020-2021 SCHOOL YEARS)**

44.   Although they denied any obligation to transport V.B. or otherwise accommodate C.B.'s disability, Superintendent George and Ms. Vining did offer, as a courtesy, to transport V.B. to her preschool program at New Monmouth.

45.   However, just one day after the District began to transport V.B. to school, New Jersey schools were closed because of the pandemic.

46.   Nevertheless, Superintendent George advised C.B. and R.B. to reach out to Ms. Vining in the summer to discuss transportation for the 2020-2021 school year.

47.   Because the District discontinued the preschool program at New Monmouth after the 2019-2020 school year, V.B.

was reassigned to Fairview Elementary School so that she could remain with the same teacher for the 2020-2021 school year.

48.  Fairview is 4.5 miles from Plaintiffs' home.

49.  During the summer of 2020, Plaintiffs reached out to Superintendent George to ensure that transportation would be provided for V.B. for the next school year.

50.  Even though Plaintiffs had decided to continue V.B. in school "virtually" at the start of the 2020-2021 school year, Superintendent George informed them that the District had allotted a space for her on a bus route and that she would be transported to her preschool program whenever they decided to send her back to school in person.

51.  As Superintendent George was leaving the District at the end of August, he said he would inform the new Superintendent, Mary Ellen Walker, about their situation to ensure that transportation would be provided for V.B. once she returned to in-person instruction.

52.  The Superintendent's secretary, Patricia Condon, told Plaintiffs that there was a note on file regarding the District's agreement to continue transportation for V.B.

53.  V.B. returned to school in February 2021, and, from then until the end of the 2020-2021 school year, the District transported V.B. to and from her preschool program at Fairview.

**(THE BOARD'S DENIAL OF PLAINTIFFS' REQUEST FOR TRANSPORTATION TO ACCOMMODATE C.B.'S DISABILITY DURING THE 2021-2022 SCHOOL YEAR)**

54.  On July 23, 2021, Plaintiffs tried to contact Ms. Vining to secure busing for the 2021-2022 school year again for V.B. who was going to start kindergarten at New Monmouth and R.B. who was about to start preschool.

55.  They were not able to reach Ms. Vining because she was on vacation, but the Assistant Transportation Coordinator, Donna Mater, told them that V.B. was on the list of bused students.

56.  She also told them that R.B. had not yet been assigned to a preschool and his busing would depend on whether there was an available space on a bus route for him.

57.  Ms. Mater advised them to email Ms. Vining about their request, which they did on that same day.

58.  On July 30, 2021, Ms. Vining told them that all "courtesy busing" cases were being reviewed and they should submit another email detailing further their situation.

59.  They did so on that same day explaining C.B.'s disability, the District's prior agreement regarding V.B.'s transportation, the need for transportation for R.B. starting in September, and the anticipated need for transportation for S.B. beginning in September 2022.

60.  In August, R.B. was assigned for preschool to Harmony Elementary School, which is 1.3 miles from their home.

61.  Despite numerous efforts in August and early September to obtain a response to their request for transportation for R.B. and confirmation of V.B.'s assignment to a bus route, Plaintiffs were not able to get answers because, they were told, approval was needed from the Superintendent.

62.  On September 8, 2021, the day school was supposed to start but for a delay in school opening, they wrote to Superintendent Walker once again explaining their situation and requesting busing for their children.

63.  By that time, to walk her children to school, C.B. would have needed to walk then five-year-old V.B., along with two and four-year-old S.B. and R.B., to and from New Monmouth (1.5 miles away) at 8:50 a.m. and 3:05 p.m.

64.  She also would have needed to walk then four-year-old R.B., along with two-year-old S.B., to and from Harmony (1.3 miles away) at 12:15 p.m. and 2:45 p.m.

65.  Altogether, she would have needed to walk her children while pushing a stroller or wagon nearly 10 miles per day.

66.  Along the way, she would have encountered telephone poles on sidewalks, including some so close to private property that she could not have walked past them on the sidewalk with a stroller or wagon. She would have had to walk either over uneven sections of private property or into the street.

67.   She would also have encountered uneven and broken sidewalks, holes in the street, raised sewer grates, garbage or recycling pails on the sidewalk (also requiring her to walk into the street), crosswalks without a light, stop sign, or crossing guard, some streets with no sidewalks at all, two blind curves, and some streets where cars regularly exceed the speed limit.

68.   In response to Plaintiffs' September 8 email, the District's Preschool Coordinator, Angela Mero, called C.B. and advised her that the District was denying their request for transportation for both children.

69.   She directed C.B. to talk to the Assistant Superintendent, Patrick Rinella, who said that transportation was denied because there was no bus route running close to their pick-up location.

70.   C.B. requested a meeting with Superintendent Walker, Assistant Superintendent Rinella and Ms. Vining.

71.   That meeting was convened virtually during the following week, and Superintendent Walker explained that they were denied transportation because there was no route running close to their pick-up location, there was a shortage of bus drivers, they do not live in a "remote zone," and their children do not have disabilities (because preschool is optional, the only students that receive transportation are students with disabilities in special education).

72.  No one at the meeting addressed the issue of whether the children were entitled to transportation as an accommodation of C.B.'s disability.

73.  The District did not provide a written response to Plaintiffs' request.

74.  An appeal to the Board merely resulted in an affirmance of the Superintendent's decision without any explanation dated October 1, 2021.

75.  As a result, Plaintiffs had to themselves transport V.B. and R.B. to school during the 2021-2022 school year notwithstanding C.B.'s inability to drive or safely walk her children to school.

76.  They were only able to get V.B. and R.B. to and from school because a neighbor was able to drive V.B. to school most days and R.B. was able to leave his job during prep time and lunch breaks to drop off R.B. in the middle of the day and pick up R.B. and V.B. after school.

77.  While this worked most days, V.B. had to miss whenever the neighbor could not go to school, for example, when the mother or her children were sick or had car trouble, and R.B. had to miss school whenever R.B. could not leave work.

78.  Transporting the kids interfered with R.B.'s work and put a great strain on him.

79.  The family explored different options to address the situation, but they cannot afford to pay for a private driver to transport the kids or for before and after school care.

80.  Sometimes, the children's grandparents have been able to transport them, but because of their age, health and distance from Plaintiffs' home, they do not offer a reliable option.

81.  Ultimately, V.B. and R.B. each missed nearly a month of school during the 2021-2022 school year, mostly stemming from their inconsistent and unreliable transportation.

**(THE DISTRICT'S DENIAL OF PLAINTIFFS' FEBRUARY 25, 2022 REQUEST FOR TRANSPORTATION AS A REASONABLE ACCOMMODATION)**

82.  On February 25, 2022, Madeleine Coghlan, an attorney with the Community Health Law Project in New Jersey, wrote a letter on behalf of the family again explaining the situation and requesting transportation as a "reasonable accommodation" of C.B.'s disability.

83.  The District ignored Ms. Coghlan's letter.

84.  After numerous attempts, Ms. Coghlan was finally able to reach the Board's attorney, Jodi Howlett, who told her that the Board was denying the request because they had no obligation to accommodate C.B.'s disability.

85.  Ms. Coghlan several times requested a written response, but she never received one.

**(THE DISTRICT'S DENIAL OF PLAINTIFFS' REQUEST FOR TRANSPORTATION AS A REASONABLE ACCOMMODATION DURING THE 2022-2023 SCHOOL YEAR)**

86.  On August 17, 2022, Plaintiffs met in person with Superintendent Walker and Amy Doherty, the District's Business Administrator.

87.  Plaintiffs explained again how C.B.'s disability-related inability to drive or safely walk her children to school was having an adverse effect on the children's attendance.

88.  Plaintiffs showed them pictures of obstacles and hazards along the route that made it especially dangerous for C.B. to walk the children to school.

89.  They also attempted to show a video highlighting the most dangerous areas of the sidewalks, but Superintendent Walker and Ms. Doherty were not interested in seeing that.

90.  Ms. Doherty equated C.B.'s situation to that of her own as a single mother and said C.B. just needed to "figure it out."

91.  They said that the District would not provide transportation for Plaintiffs' children, but that they would present their situation to the Board of Education.

92.  The following week, Superintendent Walker and Ms. Doherty called C.B. and advised her that "there is no support to provide bussing."

93.  Plaintiffs requested an opportunity to meet with the Board regarding their situation.

94.  On September 20, 2022, a meeting with the full board was held in closed session.

95.  Plaintiffs explained their situation, provided an illustration of the effect of C.B.'s visual impairment, and requested transportation as a reasonable accommodation of her disability.

96.  Plaintiffs asked if any of the Board members had questions, but no one asked a question or said anything.

97.  On September 22, 2022, Plaintiffs received an email from Ms. Doherty (also the Board Secretary) stating the following:

> The Board of Education discussed and carefully considered the information that you presented on Tuesday evening. While the Board understands and sympathizes with your disability, the consensus of the Board was that your children are ineligible for transportation based upon Board policy. These are not simple decisions for the Board and the administration to make, but it is vital that policies are administered consistently when considering each individual case across the district.

98.  Like last year, Plaintiffs this 2022-2023 school year have pulled together a hodgepodge of resources to get their children to school (S.B. started in September 2022, and has the same schedule and attends the same school as R.B.)

99.  The children's school attendance continues to suffer as V.B. has missed 17 days of school and R.B. and S.B. have each missed 25 days of school this year already.

100. V.B., R.B., and S.B. have missed developmentally important events at school, such as show-and-tell, special helper days, field trips, book fair, fun dress-up days, and holiday parties, which foster life-long memories and friendships.

101. They have expressed feelings of sadness at being left out especially when their peers discuss exciting school-related events they have missed.

102. They also stand to fall behind in academic benchmarks, face truancy charges and possible grade retention, and, as they get older, lose course credit and be ineligible for after-school activities and sports.

103. Inconsistent and unreliable transportation will continue to cause the children to worry and cry about things such as not handing in homework on time, missing special school events, teachers being upset that they are absent again, and their friends forgetting about them.

104. Year after year, this will perpetuate a pattern of anxiety, stress, and poor academic performance.

105. The children are unnecessarily reminded of limitations caused by C.B's disability whenever they cannot attend school because C.B. can no longer drive them or safely walk them.

106. The District's failure to accommodate C.B.'s disability has also caused C.B. to suffer mental anguish,

doubting her self-worth to the family, and anxiety due to the daily uncertainties of how and if her children will get to school.

107. It is nearly a daily challenge to arrange school transportation on top all of the other transportation needs of the family (doctor's appointments, food shopping, extracurriculars, play dates, kids birthday parties, etc.)

108. This has caused additional strain in Plaintiffs' marriage.

109. The District's failure to accommodate C.B.'s disability continues to place a great strain on R.B. and jeopardizes his employment.

110. R.B.'s focus and attention to work has been negatively impacted due to the frequency with which he needs to leave in the middle of the day to transport R.B. and S.B. to school.

111. This current school year (2022-2023), R.B. only has a mere 30 minutes (R.B.'s lunch period) to leave work and bring R.B. and S.B. to school, leaving no time for R.B. to eat his lunch on these days.

112. R.B.'s lunch also begins at 12:15 p.m. which is the same time preschool begins for R.B. and S.B.

113. Each day R.B. drives them, they are tardy 15-20 minutes which disrupts classroom routines crucial at these young ages.

114. It would place a serious unaffordable economic hardship on the family if they had to hire someone to transport the children to school.

## COUNT I
### (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)

115. Plaintiffs incorporate by reference paragraphs 1-114, above, as if fully set forth herein.

116. Under Section 504, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

117. Also under Section 504, a person who does not have a disability may not be subjected to such discrimination because of their association with a person with a disability. *See Souders v. Sch. Dist. of Philadelphia*, No. CV 18-2167, 2018 WL 5117196, at *4 (E.D. Pa. Oct. 19, 2018).

118. Section 504 imposes a duty upon federally funded programs to make "reasonable accommodations" or "reasonable modifications" to its policies and programs to accommodate the needs of individuals with disabilities. *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 115 (3d Cir. 2018).

119. Here, the Board has repeatedly failed to reasonably modify its Student Transportation Policy to accommodate C.B.'s disabilities by transporting V.B., R.B., and S.B. to school since C.B. cannot drive or safely walk them to school because of her disability.

120. This failure constitutes unlawful discrimination under Section 504 against both C.B. herself, on account of her disability, and R.B., V.B., R.B., and S.B. on account of their association with C.B.

121.    As a result of this discrimination, C.B. and R.B. have suffered severe emotional distress and the children have suffered substantial educational losses and severe emotional distress.

122.    Unless the Board is required to reasonably modify its Student Transportation Policy and transport V.B., R.B., and S.B. to school, Plaintiffs and their children will continue to suffer emotional harm and the children will continue to suffer educational losses.

**WHEREFORE**, Plaintiffs demand Judgment in their favor and against the Board and an order granting the following relief:

A. An order directing the Board to reasonably modify its Student Transportation Policy to accommodate C.B.'s disability by transporting V.B., R.B., and S.B. to school;

B. An award of compensatory educational services;

C. An award of compensatory damages;

D. An award of reasonable attorneys' fees and costs; and

E. Such other relief as is just and appropriate.

**COUNT II**
**(Title II of the Americans with Disabilities Act,**
**42 U.S.C. § 12131, *et seq.*)**

123. Plaintiff incorporates by reference paragraphs 1-122, above, as if fully set forth herein.

124. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

125. Under the Title II regulation, "[a] public entity shall not exclude or otherwise deny equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 28 C.F.R. § 35.130(g).

126. Additionally, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that

making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7)(i).

127. When an individual requests a modification of a program or policy to accommodate a disability, an "individualized inquiry" must be made to determine if the modification would be reasonable under the circumstances. *Wright v. New York State Dep't of Corr.,* 831 F.3d 64, 77 (2d Cir. 2016); *Starego v. New Jersey State Interscholastic Athletic Ass'n*, 970 F. Supp. 2d 303, 309 (D.N.J. 2013).

128. Here, notwithstanding R.B. and C.B.'s multiple requests for a reasonable modification of the Board's Student Transportation Policy to accommodate C.B.'s disability, the Board never engaged in an individualized inquiry to determine whether the requested accommodation was reasonable under her particular circumstances.

129. Furthermore, the Board repeatedly failed to reasonably modify its Student Transportation Policy to accommodate C.B.'s disabilities by transporting V.B., R.B., and S.B. to school since she cannot drive or safely walk them to school because of her disability.

130. This failure constitutes unlawful discrimination under the ADA against C.B. herself, on account of her disability, and R.B., V.B., R.B., and S.B., on account of their association with C.B.

131. As a result of this discrimination, C.B. and R.B. have suffered severe emotional distress and the children have suffered substantial educational losses and emotional distress.

132. Unless the Board is required to reasonably modify its Student Transportation Policy and transport V.B., R.B., and S.B. to school, Plaintiffs and their children will continue to suffer emotional harm and the children will continue to suffer educational losses.

**WHEREFORE,** Plaintiffs demand Judgment in their favor and against the Board and an order granting the following relief:

A. An order directing the Board to reasonably modify its Student Transportation Policy to accommodate C.B.'s disability by transporting V.B., R.B., and S.B. to school;

B. An award of compensatory educational services;

C. An award of compensatory damages;

D. An award of reasonable attorneys' fees and costs; and

E. Such other relief as is just and appropriate.

### COUNT III
### (New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*)

133. Plaintiffs incorporate by reference paragraphs 1-132, above, as if fully set forth herein.

134. The New Jersey Law Against Discrimination (LAD) guarantees that, "All persons shall have the opportunity to . . .

. obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . disability. . . ." N.J.S.A. 10:5-4.

135. Under the LAD, public schools are a place of public accommodation. N.J.S.A. 10:5-5(l).

136. The LAD prohibits "any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation [from] directly or indirectly refus[ing], withhold[ing] from or deny[ing] . . . any person any of the accommodations, advantages, facilities or privileges thereof, or [from] discriminat[ing] against any person in the furnishing thereof . . . on account of . . . disability . . . ." N.J.S.A. 10:5-12(f)(1).

137. The LAD also provides that "An owner ... or employee of any place of public accommodation shall make such reasonable modifications in policies, practices, or procedures, as may be required to afford goods, services, facilities, privileges, advantages, or accommodations to a person with a disability, unless the owner ... or employee of the place of public accommodation demonstrates that making the modifications would impose an undue burden on its operation." *Ellison v. Creative*

*Learning Ctr.*, 383 N.J. Super. 581, 593, 893 A.2d 12, 19 (App. Div. 2006) (quoting N.J.A.C. 13:13-4.11).

138. While the LAD does not explicitly set forth a cause of action for associational discrimination, both the federal courts have recognized associational discrimination claims under the LAD. *See Bowie v. Costco Wholesale Corp.*, No. 16-5808-BRM-LHG, 2017 U.S. Dist. LEXIS 116814, at *22-3 (D.N.J. July 22, 2019).

139. Here, the Board has repeatedly failed to reasonably modify its Student Transportation Policy to accommodate C.B.'s disabilities by transporting V.B., R.B., and S.B. to school since C.B. cannot drive or safely walk them to school because of her disability.

140. This failure constitutes unlawful discrimination under the LAD against both C.B. herself, on account of her disability, and R.B., V.B., R.B., and S.B. on account of their association with C.B.

141. As a result of this discrimination, C.B. and R.B. have suffered severe emotional distress and the children have suffered substantial educational losses and severe emotional distress.

142. Unless the Board is required to reasonably modify its Student Transportation Policy and transport V.B., R.B., and S.B.

to school, Plaintiffs and their children will continue to suffer emotional harm and the children will continue to suffer educational losses.

**WHEREFORE,** Plaintiffs demands Judgment in their favor and against the Board and an order granting the following relief:

A. An order directing the Board to reasonably modify its Pupil Transportation Policy to accommodate C.B.'s disabilities by transporting V.B., R.B., and S.B. to school;

B. An award of compensatory educational services;

C. An award of compensatory damages;

D. An award of reasonable attorneys' fees and costs; and

E. Such other relief as is just and appropriate.

Dated: February 17, 2023      Law Office of David R. Giles
                                        Attorney for the Plaintiffs

_____
By:  David R. Giles